**UNITED STATED DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEGHAN ABBOTT,<br><br>                              Plaintiff,<br><br>     v.<br><br>WELSPUN INDIA LTD., and WELSPUN USA INC.,<br><br>                              Defendants. | **CASE NO. 1:16-cv-6792**<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## I.      INTRODUCTION

1.      This case involves a widespread fraud perpetrated by one of the world's largest textile markets, Welspun India Ltd. and its U.S. subsidiaries. For years, Welspun has sold and marketed bed linens as made from "Egyptian cotton," which commands a premium in the market because it is perceived as higher quality. In fact, Welspun uses inferior and less expensive cottons in many of its "Egyptian" cotton bed linens. As a result, consumers who have purchased Welspun bed linens have overpaid for an inferior product. This action seeks full recompense for Welspun consumers as well as punitive damages for the egregious conduct.

## II.     PARTIES

### A.      Plaintiff

2.      Plaintiff, Meghan Abbott, is an individual residing in the State of North Carolina. While in North Carolina, Plaintiff purchased Fieldcrest bed linens by Welspun from Target.

### B.      Defendants

3.      Defendant Welspun India Ltd. is a textile company based in India. It is one of the world's largest home textile manufacturers and markets itself as "a fully integrated one-stop shop for home textiles" including "towels, bath robes, bath rugs/mats, area rugs, carpets, bed linens, utility bedding and fashion bedding."

4.      Defendant Welspun USA Inc. is a textile company incorporated in Delaware with its principal place of business in New York. Upon information and belief, Welspun USA Inc. does business throughout the United States and within this District.

5.      Defendants Welspun India and Welspun USA Inc. are referred to collectively herein as "Welspun" or Defendants.

6.      Defendants market and sell or have marketed and sold bed linens in the United States under the Fieldcrest, Crowning Touch, Waverly, Ralph Lauren, Charter Club, Cannon, Royal Velvette, Nautica, Nicole Miller, Umbra, and Chaps brands.

## III.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendants are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d). Venue is proper in this District because one or more of the defendants resides, transacts business, is found or has agents in this District, because a part of the events giving rise to Plaintiff's claims occurred in this District, and a portion of the affected interstate trade and commerce, as described below, was carried out in this District.

9.      This Court has personal jurisdiction over Defendant Welspun USA because, among other things, Defendant Welspun USA is (a) headquartered in this District; (b) has transacted business throughout the United States, including in this District, and continues to do so; (c) has delivered or sold substantial quantities of bed linens and other products throughout the United States, including in this District, and continues to do so; (d) had and has substantial

contacts within the United States, including in this District; and (e) was and is engaged in conduct that was directed at, and had a direct, foreseeable, and intended effect of causing injury to the business or property of, persons residing in, located in or doing business throughout the United States, including in this District.

10.     This Court has personal jurisdiction over Defendant Welspun India Ltd. ("Welspun India"). Defendant Welspun India Ltd. has contracted directly or through its wholly owned controlled subsidiaries with retailers located in the United States. Welspun India has manufactured textiles, including those giving rise to this litigation, for the purpose of exporting them to the United States and has in fact done so. Welspun India directly or through its subsidiaries has delivered or sold substantial quantities of bed linens and other products throughout the United States, including this District, and continues to do so. Specifically, Welspun India in its annual report claims to have over 20% market share in the U.S. "towels segment" and over 10% share in U.S. "bed linens segment." Welspun India has also conducted nationwide marketing campaigns in the United States, including but not limited to campaigns for its patented Hygrocotton, which it uses in its towels.

IV.     **EGYPTIAN COTTON MARKET**

11.     Commercial cotton production for export began in Egypt in the 1820s when a Frenchman discovered a species of cotton growing in a fine garden in Cairo. This cotton species, Gossypium barbadense, was characterized by unusually fine, long silky fibers or "staples." The fibers of Gossypium barbadense, or Egyptian cotton, had the unique property of being strong enough to withstand the new cotton gin but at the same time being fine enough to create very high thread count textiles.

12.     When the Civil War broke out in the United States in 1861 and disrupted cotton supplies from southern states, Egyptian production skyrocketed. Egyptian cotton soon became synonymous with premium cotton because textiles produced with it were both stronger and softer than textiles produced with other cottons. Indeed, the phrase "Egyptian cotton" has become virtually synonymous in the consuming public's mind with luxury high-end extra-long staple cotton, which generally trades on commodity markets for a premium of 100% or more over regular cotton of low or middle staple length.

13.     For much of the modern era, the production of Egyptian cotton was highly subsidized by the Egyptian government. Beginning in the 1990's, however, protectionist policies were gradually relaxed under the influence of economic policies advocated by the International Monetary Fund. The result has been a slow decline in Egyptian cotton production, which has been recently exacerbated by recent political and economic instability. In 2016, the U.S. Department of Agriculture predicts that Egypt will produce only one third of the cotton it produced in 2006.

14.     As a result of falling production, obtaining genuine Egyptian cotton has become increasingly difficult. Because only Gossypium barbadense grown in Egypt can be called Egyptian Cotton, the predictable result has been rampant fraud. Indeed, the Cotton Egypt Association estimates that approximately 90% of cotton marketed as "Egyptian cotton" is not, in fact, Egyptian cotton.

## V.      DEFENDANTS' FALSE ADVERTISING

15.     "Your comfort is our commitment" claims Defendant Welspun India in corporate presentations. In fact, Defendants' commitment is to their own profits rather than the consumer. In the mid-2000s, Defendants determined that one way to increase those profits was to "move[]

up the value chain" in the U.S. market by manufacturing and selling purportedly higher end products. As part of that strategy, Defendants began a concerted campaign to market and sell home textiles, including bed linens, purportedly made from "100% Egyptian Cotton," which met their goal of selling home textiles, including bed linens, that would be perceived as "softer and finer" with "higher counts of yarn" *i.e.,* higher thread counts.

16.     Defendants marketed and sold bed linens to U.S. retailers, including but not limited to Target, Walmart, JCPenney and Bed Bath & Beyond.

17.     By marketing certain of their bed linens as "100% Egyptian Cotton," Defendants were able to sell the bed linens at a significant premium to bed linens not labeled as "100% Egyptian Cotton."

18.     Among the bed linens marketed in the United States were bed linens marketed under the Fieldcrest label for Target that purported to consist of 100% Egyptian Cotton and have a 500-thread count.

19.     Sometime prior to August 2016, Target became aware that Welspun might be substituting cheaper non-Egyptian cotton in its Fieldcrest label bed linens. On August 19, 2016, after "extensive investigation," Target was able to confirm in fact that "Welspun substituted another type of non-Egyptian cotton when producing these bed linens between August 2014 and July 2016."

20.     Target also announced that it was terminating its relationship with Defendants.

21.     Defendants have admitted to the unlawful conduct stating "[w]ithout any ambiguity, the fault is on our side."

22.     Nevertheless, Defendants' website www.shopwelspun.com continues to advertise bed linens as "100% Egyptian Cotton" even though Defendants know or should know that no basis exists for that claim.

## VI.     INJURY TO PLAINTIFF

23.     Within the last year, Plaintiff visited a Target store located on Retail Drive in Wake Forest, North Carolina in order to purchase a set of bed linens for herself and her husband.

24.     Plaintiff selected a set of Queen size gray bed linens labeled "100% Egyptian cotton."

25.     In purchasing the bed linens, Plaintiff relied on the fact that the bed linens were labeled as being "100% Egyptian cotton." Plaintiff believed that the bed linens were indeed made of 100% Egyptian cotton, and, because of this, she believed the bed linens were higher quality, softer, more durable bed linens than other cotton bed linens not made from Egyptian cotton. As a result, Plaintiff was prepared to pay a premium for the bed linens.

26.     The label on the bed linens purchased by Plaintiff includes the following: Fieldcrest Luxury Made in India 100% Egyptian cotton, RN No. 17730, and VN No. 1149546.

27.     On information and belief, these bed linens are among those identified by Target as not containing "100% Egyptian Cotton" as advertised.

## VII.     CLASS ALLEGATIONS

28.     This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4), 23(b)(3).

29.     Plaintiff brings this action as a Class Action on behalf of herself and all others similarly situated as a member of a Class ("Class"), defined as follows:

All persons who purchased Affected Bed Linens that were manufactured or distributed by one or more Defendants and labeled as "100% Egyptian Cotton."

30.     Affected Bed Linens currently include (1) Target: Fieldcrest 500 Threadcount "100% Egyptian cotton" Geo Pattern bed linens or Satin-Stitch Damask bed linens; (2) Walmart: Crowning Touch Label, 500 or 800 TC, "100% Egyptian cotton"; and (3) Bed Bath and Beyond: Crowning Touch Label, 500 or 800 TC, "100% Egyptian cotton." It is expected that upon further investigation additional Affected Bed Linens will be discovered.

31.     Excluded from the Class are Defendants; any entity in which Defendants have a controlling interest; any of the officers, directors, or employees of Defendants; and the legal representatives, heirs, successors and assigns of Defendants.

32.     The members of the Class are so numerous and widely dispersed that joinder of them in one action is impractical. On information and belief, that millions of Class members have purchased bed linens falsely advertised as "100% Egyptian cotton."

33.     There are common questions of law and fact as to all members of the Class that predominate over any questions affecting individual Class members, including:

a.   Whether Defendants advertised textiles as Egyptian cotton when in fact the cotton originated, in whole or in part, from a country other than Egypt;

b.   Whether Defendants knew that the cotton they labeled as Egyptian cotton did not originate in Egypt;

c.   Whether Defendants advertised or labeled textiles as Egyptian cotton when in fact the cotton was not Gossypium barbadense.

d.   Whether Defendants were able to charge higher prices for their home textile products that they otherwise would have been able to do by labeling them as Egyptian cotton;

e.   Whether Plaintiff and Class Members are entitled to damages, restitution, injunctive relief, and declaratory relief;

f.   Whether Defendants should disgorge unlawful profits; and

g.  The appropriate class-wide measure of damages.

34.     Plaintiff's claims are typical of the Class she represents. Both Plaintiff and the

Class' claims arise out of the same course of conduct and same legal theories. Plaintiff

challenges the practices and course of conduct engaged in by Defendants with respect to the

Class as a whole.

35.     Plaintiff is an adequate representative of the Class because her interests do not

conflict with the interests of Class members she seeks to represent. Plaintiff has retained counsel

competent and experienced in class action litigation who intend to vigorously prosecute this

action.

36.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all the Class members is impracticable.

Furthermore, no individual class member can justify the commitment of the large financial

resources to vigorously prosecute a lawsuit against Defendants and the adjudication of this

controversy through a class action will avoid the possibility of inconsistent and potentially

conflicting adjudication of the claims asserted herein. There will be no difficulty in the

management of this action as a class action.

## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

37.     Plaintiff realleges and incorporates by reference the allegations contained in the

preceding paragraphs.

38.     Defendants represented that the bed linens purchased by Plaintiff and class

members were 100% Egyptian cotton.

39.     Defendants had unique and special expertise in the manufacture of home textile

products and the sourcing of Egyptian cotton. Only Defendants had access and knowledge of

their own supply chain, which would be required to verify that their home textiles were 100% Egyptian cotton.

40.     Defendants were aware that Plaintiff and other consumers would view their labeling of home textile products as "100% Egyptian Cotton" as a guarantee of superior quality and softness.

41.     Defendants intended Plaintiff and consumers to rely on those representations and pay a premium for the purportedly premium "100% Egyptian Cotton" bed linens. Indeed, the sole purpose of the misrepresentation was to induce Plaintiff and class members to purchase Defendants' bed linens.

42.     Plaintiff and class members reasonably relied on the representation that the bed linens were "100% Egyptian Cotton" when purchasing the bed linens.

43.     The bed linens purchased by Plaintiff and class members were not, in fact, 100% Egyptian cotton.

44.     As a result of this misrepresentation, Plaintiff and class members were injured. Specifically, they paid a premium for "100% Egyptian Cotton" bed linens but received bed linens that were not "100% Egyptian Cotton."

**FRAUD**
**(Against All Defendants)**

45.     Plaintiff realleges and incorporates by references the allegations contained in the preceding paragraphs.

46.     Defendants represented that the bed linens purchased by Plaintiff and class members were 100% Egyptian cotton.

47.     That representation was false and, on information and belief, must have been known to Defendants to be false because their raw material prices would not have been consistent with the use of "100% Egyptian Cotton."

48.     Defendants were aware that Plaintiff and other consumers would view their labeling of home textile products as "100% Egyptian Cotton" as a guarantee of superior quality and softness.

49.     Defendants intended Plaintiff and consumers to rely on those representations and pay a premium for the purportedly premium "100% Egyptian Cotton" bed linens. Indeed, the sole purpose of the misrepresentation was to induce Plaintiff and class members to purchase Defendants' bed linens.

50.     Plaintiff and class members reasonably relied on the representation that the bed linens were "100% Egyptian Cotton" when purchasing the bed linens.

51.     As a result of this misrepresentation, Plaintiff and class members were injured. Specifically, they paid a premium for "100% Egyptian Cotton" bed linens but received bed linens that were not "100% Egyptian Cotton."

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and for members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

a)     Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel and Plaintiff as class representative;

b)     An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

c)     Costs, restitution, damages, including statutory and punitive damages, and disgorgement in an amount to be determined at trial;

d)     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

e)     An award of costs and attorneys' fees; and

f)     Such other or further relief as may be appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.


Dated: August 29, 2016.                          Respectfully submitted,

                                                 HAGENS BERMAN SOBOL SHAPIRO LLP


                                                 By:   s/ Jason A. Zweig
                                                    _____

                                                 Jason A. Zweig
                                                 555 Fifth Avenue, Suite 1700
                                                 New York, NY 10017
                                                 Telephone: (212) 752-5455
                                                 Facsimile: (212) 210-3980
                                                 jasonz@hbsslaw.com

                                                 Robert B. Carey *(pro hac vice* pending)
                                                 Leonard W. Aragon *(pro hac vice* pending)
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 11 West Jefferson Street, Suite 1000
                                                 Phoenix, Arizona 85003
                                                 Telephone:  (602) 840-5900
                                                 Facsimile:  (602) 840-3012
                                                 rob@hbsslaw.com
                                                 leonard@hbsslaw.com


                                                 Stuart M. Paynter *(pro hac vice* pending)
                                                 THE PAYNTER LAW FIRM PLLC
                                                 1200 G. Street NW, Suite 800
                                                 Washington, D.C.  20005
                                                 Telephone: (202) 626-4486
                                                 Facsimile: (866) 734-0622
                                                 stuart@paynterlawfirm.com