**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

*In re Welspun Litigation*

Civil Action No. 16-cv-06792 (RJS)

**CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT**

Plaintiffs Harold Brower, Judi Talili, Samuel Jividen, and Ashley Mistler ("Plaintiffs"),

by their attorneys, make the following allegations pursuant to the investigations of counsel and

upon information and belief, except as to the allegations specifically pertaining to themselves

and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against Welspun India Ltd., its subsidiary Welspun USA Inc.

(collectively, "Welspun"), Wal-Mart Stores, Inc. d/b/a Walmart ("Walmart"), Bed Bath and

Beyond, Inc. ("BB&B"), and Target Corporation ("Target") (collectively, "Defendants") for

distributing, marketing, and selling Welspun bed linens that, despite being labeled as "100%

Egyptian cotton," were not 100% Egyptian cotton.  Egyptian cotton linens command a premium

in the market due to their superior quality, durability, and association with luxury products.

Welspun's "100% Egyptian Cotton" linens, however, are made with less expensive and inferior

non-Egyptian cotton, and are pawned-off to consumers at a substantial premium over other

cotton linens that are not labeled 100% Egyptian cotton.

2.      Labeling a product as "100% Egyptian cotton" when it is made from other types

of cotton violates federal and state laws, including the Textile Fiber Products Identification Act,

15 U.S.C. § 70 *et seq*. (the "Textile Act"), which prohibits companies from misrepresenting the

origin of cotton in cotton products.  It is likewise unlawful under the Textile Act to sell, offer to

sell, advertise, deliver, or transport any textile fiber product which is misbranded or falsely or deceptively advertised.

3.      Because Plaintiffs and the proposed class members have been damaged by the false labeling of Welspun products, Plaintiffs bring this action seeking for themselves, and all other similarly situated purchasers of Welspun linen products, compensatory damages, restitution, injunctive relief, statutory damages, and punitive damages.

## THE PARTIES

4.      Plaintiff Harold Brower is a citizen of California, residing in Escondido.  In or about March 2016, Mr. Brower purchased "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton" from Target.  Prior to purchasing the bed linens, Mr. Brower reviewed the product packaging, which prominently stated on the front of the package that the product was "100% Long-Staple Egyptian Cotton."  Mr. Brower read and relied on the representation that the bed linens were made from 100% long-staple Egyptian cotton, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton.  Mr. Brower relied on these representations and warranties in deciding to purchase the bed linens, and he would not have purchased the product if he had known that the product was not 100% long-staple Egyptian cotton.  Mr. Brower purchased the product at a substantial price premium expecting that it would be made from 100% long-staple Egyptian cotton.  He also understood that in making the sale, Target was acting with knowledge and approval of Welspun and/or as the agent of Welspun.  He also understood that the purchase involved a direct transaction between himself and Welspun, because his purchase came with Welspun's representation that the product was, in fact, 100% long-staple Egyptian cotton.

5.      Plaintiff Judi Talili is a citizen of California, residing in Santa Ana.  In or about 2014, Ms. Talili purchased "Perfect Touch" brand linens labeled "100% Egyptian Cotton" from

BB&B and "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton" from Target.

Prior to purchasing the bed linens, Ms. Talili reviewed the product packaging, which

prominently stated on the front of the package that the products were "100% Egyptian Cotton" or

"100% Long-Staple Egyptian Cotton."  Ms. Talili read and relied on the representation that the

bed linens were made from 100% Egyptian cotton, and understood them to be representations

and warranties that the products were, in fact, made only of Egyptian cotton.  Ms. Talili relied on

these representations and warranties in deciding to purchase the bed linens, and she would not

have purchased the products if she had known that they were not 100% Egyptian cotton.  Ms.

Talili purchased the products at a substantial price premium expecting that they would be made

from 100% Egyptian cotton.  She also understood that in making the sale, BB&B and Target

were acting with knowledge and approval of Welspun and/or as the agents of Welspun.  She also

understood that the purchase involved a direct transaction between herself and Welspun, because

her purchase came with Welspun's representation that the product was, in fact, 100% Egyptian

cotton.

      6.     Plaintiff Samuel Jividen is a citizen of New York, residing in Rochester.  Mr.

Jividen purchased "Crowning Touch" brand linens labeled "100 % Egyptian Cotton" from

BB&B in approximately June 2015.  Prior to purchasing the bed linens, Mr. Jividen reviewed the

product packaging, which prominently stated on the front of the package that the product was

"100% Egyptian Cotton."  Mr. Jividen read and relied on the representation that the bed linens

were made from 100% Egyptian cotton, and understood them to be representations and

warranties that the product was, in fact, made only of Egyptian cotton.  Mr. Jividen relied on

these representations and warranties in deciding to purchase the bed linens, and he would not

have purchased the product if he had known that the product was not 100% Egyptian cotton.  Mr.

Jividen purchased the product at a substantial price premium expecting that they would be made

from 100% Egyptian cotton.  He also understood that in making the sale, BB&B was acting with knowledge and approval of Welspun and/or as the agent of Welspun.  He also understood that his purchase involved a direct transaction between himself and Welspun, because his purchase came with Welspun's representation that the products were, in fact, 100% Egyptian cotton.

7.     Plaintiff Ashley Mistler is a citizen of California, residing in West Sacramento. Ms. Mistler purchased "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton" from Target in 2016.  Ms. Mistler also purchased "Better Homes and Gardens" brand linens labeled "100% Egyptian Cotton" from Walmart in 2016.  Prior to purchasing the bed linens, Ms. Mistler reviewed the product packaging, which prominently stated on the front of the package that the product was "100% Long-Staple Egyptian Cotton" or "100% Egyptian Cotton."  Ms. Mistler read and relied on the representation on the product packaging, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton. Ms. Mistler relied on these representations and warranties in deciding to purchase the bed linens, and she would not have purchased the product if she had known that the product was not made only of Egyptian cotton.  Ms. Mistler purchased the product at a substantial price premium expecting that they would be made only from Egyptian cotton.  She also understood that in making the sales, Target and Walmart were acting with knowledge and approval of Welspun and/or as the agents of Welspun.  She also understood that the purchases involved a direct transaction between herself and Welspun, because her purchases came with Welspun's representation that the products were, in fact, 100% Egyptian cotton.

8.     Defendant Welspun India Ltd. is a textile company based in Mumbai, India.  It is one of the world's largest textile manufacturers.  More than 68 percent of its production is exported to the United States.

9.     Defendant Welspun USA Inc. is a textile company and wholly owned subsidiary of Welspun India Ltd.  It is a Delaware company with its principal place of business at 295 5th Ave., New York, NY 10016.  Welspun USA Inc. does business throughout the United States and within this District.

10.     Defendant Walmart is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Walmart is the world's largest retailer and ranks No. 15 on Forbes Global 2000 list of the world's biggest public companies.  Walmart sold, offered to sell, advertised, delivered, and transported Welspun textile products, including "Better Homes and Gardens" and "Canopy" brand linens labeled "100% Egyptian Cotton."

11.     Defendant BB&B is a New York corporation with its principal place of business in Union, New Jersey.  BB&B operates the largest houseware goods specialty stores in the United States, and operates 300 stores that sell a variety of domestic merchandise.  BB&B sold, offered to sell, advertised, delivered, and transported Welspun textile products, including "Perfect Touch" and "Crowning Touch" brand linens labeled "100% Egyptian Cotton."

12.     Defendant Target is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Target is the second largest general merchandise retailer in the United States, and operates 1,802 retail stores.  Target sold, offered to sell, advertised, delivered, and transported Welspun textile products, including "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton."

13.     Collectively, Defendants distributed, marketed, and sold Welspun-manufactured bed linens labeled "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton" throughout the United States, including California and New York.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1331, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because there are more than 100 class members and the aggregate amount in controversy exceeds

$5,000,000.00, exclusive of interest, fees, and costs, and because members of the proposed class

are citizens of a state different from the state of Defendants.

15.     Venue is proper in this judicial district because the parties are subject to the JPML

order transferring this litigation here.  Venue also is proper under 28 U.S.C. § 1331(a) because a

substantial part of the events, omissions and acts giving rise to the claims herein occurred in this

district.  Defendant Welspun USA's principal place of business is in this district, and all

Defendants distributed, advertised and/or sold linens mislabeled as "100% Egyptian cotton" or

"100% Long-Staple Egyptian Cotton" in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

### I.     Egyptian Cotton Is Prized For Its Durability, Softness And Quality

16.     Egyptian cotton is considered some of the highest-quality cotton in the world.  A

combination of climate and cultivation methods used in Egypt result in Egyptian cotton having

longer cotton fibers (or "staples") than other types of cotton.  In general, the longer the fiber, the

more high quality the fabric because longer fibers translate into more uninterrupted fiber to use

when making yarn and threads.  This feature results in fewer splices and a stronger, more durable

fabric.  Standard cotton sheets, in contrast, use shorter fibers that are twisted and combined to

produce the right length – a process that results in a weaker weave and a product that is more

susceptible to wear, tear, and shredding.

17.     Longer fibers also generate finer yarn, which in turn allows manufacturers to pack more thread counts into each square inch.  Hence, Egyptian cotton linens are softer and more lustrous than linens made of other types of cotton.

18.     Egyptian cotton also is more porous than regular cotton, which makes Egyptian cotton sheets more comfortable to sleep on than standard cotton or polyester sheets because they absorb moisture better.  Egyptian cotton also absorbs dye more thoroughly than regular cotton, allowing for richer colors that resist fading longer.

19.     100% Egyptian cotton linens are widely regarded as the highest-quality option on the market when it comes to high-end linens, and consumers pay a substantial premium for 100% Egyptian cotton linens.

20.     Although cotton is one of Egypt's most well-known exports, only a small percentage of all cotton produced in the world comes from Egypt.  That percentage has steadily declined over the last decade due to reductions in government subsidies, and recent economic and political instability has exacerbated the problem.  According to a U.S. Department of Agriculture report, cotton production in Egypt experienced a "jaw-dropping decline" of 50 percent in 2016, compared to 2015.[1]  With the supply of Egyptian cotton dwindling, unscrupulous businesses have resorted to pawning-off non-Egyptian cotton as Egyptian cotton.  The Cotton Egypt Association, a non-profit trade association in Egypt, reports that it conducted random DNA tests of home textiles sold in retail stores in the United States and other countries, and found that 90 percent of the products tested contained no Egyptian cotton, despite being labeled as such.

---

[1] Beyond All Expectations:  Egypt's 2016 Cotton Production Set to Plummet.  U.S.D.A. Foreign Agricultural Service, June 7, 2016, *available at* http://gain.fas.usda.gov/R ecent%20GAIN%20Publications/Beyond%20All%20Expectations%20Egypt%E2%80%99s%20 2016%20Cotton%20_Cairo_Egypt_6-7-2016.pdf

II.   **Selling, Advertising, Delivering, Or Transporting Cotton Mislabeled As "Egyptian Cotton" Violates The Textile Fiber Products Identification Act And Federal Regulations Governing The Labeling Of Cotton Products**

21.     The Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. § 70 *et seq*., governs labeling and advertising of textile products, and provides:

> The introduction, delivery for introduction, manufacture for introduction, sale, advertising, or offering for sale, in commerce, or the transportation or causing to be transported in commerce, or the importation into the United States, of any textile fiber product which is misbranded or falsely or deceptively advertised . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

15 U.S.C. § 70a(a).

22.     The Textile Act further provides:

> The sale, offering for sale, advertising, delivery, transportation, or causing to be transported, of any textile fiber product which has been advertised or offered for sale in commerce, and which is misbranded or falsely or deceptively advertised . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

*Id.* at § 70a(b).

23.     Under the Textile Act, the term "textile fiber product" includes "any household textile article made in whole or in part of yarn or fabric." *Id.* at § 70(h)(3). Cotton linen is a "textile fiber product" within the meaning of the Textile Act.

24.     The Textile Act further provides that a textile fiber product "shall be misbranded if it is falsely or deceptively stamped, tagged, labeled, invoiced, advertised, or otherwise identified as to the name or amount of constituent fibers contained therein." *Id.* at § 70b(a).

25.     The Federal Trade Commission ("FTC") has promulgated rules governing the labeling of textile products. Under 16 C.F.R. § 303.16(a), a label must disclose the "generic name" of the constituent fibers of a product (such as "cotton"). Under 16 C.F.R. § 303.16(d),

additional descriptive terms (such as "Egyptian cotton") may be included on the label, but only if

they are "non-deceptive" and "are properly and truthfully descriptive" of the fiber used in the

product.  Under 16 C.F.R. § 303.27, "the word 'All' or the term '100%' may be used in labeling,

together with the correct generic name of the fiber and any qualifying phrase [i.e., 100%

Egyptian cotton]," only if the product "is comprised wholly" of that fiber.

26.     All of the Defendants are required to comply with the Textile Act.

**III.   Welspun Markets And Sells Bed Linens Labeled As "100% Egyptian Cotton" In Major Retailers Across The United States**

27.     Welspun manufactures, markets, and sells linens that are purportedly "100%

Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" in the United States under the

Fieldcrest, Crowning Touch, Perfect Touch, Better Homes and Gardens, Royal Velvet, and

Canopy brands, among others (collectively, the "Affected Bed Linens").  Welspun's "100%

Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" linens are sold online and in major

retail stores across the United States, including at Walmart, BB&B, and Target.[2]  The Affected

Bed Linens include, among others, the following products:

   a.  Fieldcrest 500 thread count "100% Long-Staple Egyptian Cotton" bed linens;

   b.  Better Homes and Gardens 400 thread count "100% Egyptian Cotton" bed linens;

   c.  Canopy 400 thread count damask stripe "100% Egyptian Cotton" bed linens;

   d.  Crowning Touch 500 and 800 thread count "100% Egyptian Cotton" bed linens;

   e.  Perfect Touch 625 thread count "100% Egyptian Cotton" bed linens; and

   f.  Royal Velvet 400 thread count "100% Egyptian Cotton" bed linens.

28.     The Affected Bed Linens are all substantially similar.  Each Affected Ben Linen

is manufactured by Welspun and prominently displays the words "100% Egyptian Cotton" or

_____

[2] It is expected that additional retailers of Welspun "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" will be identified through discovery.  It is also expected that additional Affected Bed Linens will be identified through discovery.

"100% Long-Staple Egyptian Cotton" on its packaging, but each is made of non-Egyptian

cotton.  Accordingly, each Affected Bed Linen is misrepresented as "100% Egyptian Cotton" or

"100% Long-Staple Egyptian Cotton."

     29.     For example, the front packaging of Fieldcrest brand linens purportedly made

from Egyptian cotton uniformly states "100% Long-Staple Egyptian Cotton:"



     30.     Similarly, the front packaging of Better Homes and Gardens brand linens

purportedly made from Egyptian cotton uniformly states "Egyptian Cotton," and again states

"100% Egyptian Cotton" in the lower front portion of the packaging:



31.     The front packaging of Canopy brand linens purportedly made from Egyptian cotton also uniformly states "100% Egyptian Cotton:"



32.     The front packaging of Crowning Touch 500 thread count linens purportedly made from Egyptian cotton also uniformly states "100% Egyptian Cotton:"



33.     The front packaging of Perfect Touch brand linens purportedly made from Egyptian cotton uniformly states "100% Premium Egyptian Cotton," and also states "100% Egyptian Cotton on the back of the packaging:"



34.     Other Affected Bed Linens are also labeled "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" on the packaging.

35.     By marketing, labeling, and selling the Affected Bed Linens as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton," Defendants were able to sell the Affected Bed Linens at a significant premium compared to bed linens not labeled as "100% Egyptian Cotton."

**IV.     Welspun Admits That The Affected Bed Linens Were Mislabeled And That It Must "Take Responsibility For It"**

36.     Several months prior to August 2016, Target began an investigation into whether Welspun substituted non-Egyptian cotton in its Fieldcrest label bed linens sold in Target stores. On August 19, 2016, Target announced that it had confirmed that "Welspun substituted another type of non-Egyptian cotton when producing [Fieldcrest] bed linens between August 2014 and July 2016."  Target also announced that it was terminating its relationship with Welspun and phasing out all Welspun products.

37.     In the wake of Target's announcement, other major U.S. retailers began their own investigations into whether sheets they buy from Welspun contain Egyptian cotton.  On approximately August 24, 2016, BB&B announced its own audit of Welspun.  Approximately three months later, BB&B announced that it would no longer sell its bed linens labeled "100% Egyptian Cotton" because Welspun could not guarantee that its products were made from Egyptian cotton.

38.     On September 9, 2016, Walmart announced that it too would stop selling Egyptian cotton sheets made by Welspun and donate all of the sheets currently on its shelves.

39.     In response to these retailers' announcements, Welspun admitted to its unlawful conduct.  At an August 22, 2016 call with investors, Welspun's Managing Director Rajesh Mandawewala stated that, "without any ambiguity the fault is on our side and so it is, let's say, the error is from our side so I guess we have to take responsibility for it."[3]  Similarly, in December 2016, the Chairman of Welspun Group, BK Goenka, stated that Welspun "did accept our mistake."[4]

**V.     Walmart, BB&B, And Target Sold, Offered For Sale, Advertised, Delivered, And Transported Welspun Products That Were Mislabeled "100% Egyptian Cotton" Or "100% Long-Staple Egyptian Cotton"**

40.     Walmart, BB&B, and Target (collectively, "the Retail Defendants") each entered into contracts with Welspun to market and sell Welspun products at their respective brick-and-mortar and online stores.  As a result, each Retail Defendant sold, offered for sale, advertised, delivered, and transported the Affected Bed Linens to their respective customers across the United States.

---

[3] Transcript, Welspun India Conference Call – Recent Business Developments, August 22, 2016, *available at* http://corporates.bseindia.com/xml-data/corpfiling/AttachLive/445CCBBC_BEE2_42A4_8384_A6CD00303F80_093036.pdf

[4] Welspun Tries to Make a Comeback and Gain Ties With Other Retailers, Indian Retailer.com, Dec. 15, 2016, *available* at http://retail.franchiseindia.com/news/Welspun-tries-to-make-a-comeback-and-gain-ties-with-other-retailers.n6868/.

41.     During the relevant period, Welspun acted in concert with each Retail Defendant, and with the knowledge and approval of and/or as the agent of each other, and within the course and scope of the agency, regarding the acts and omissions alleged.

42.     Each of the Retail Defendants either knew or should have known that the Affected Bed Linens were falsely labeled prior to discontinuing their sales, because that fact would have been apparent if they had adequate quality control procedures in place.  Walmart, for example, stated in September 2016 that "our customers trust us to provide products that are what they say they are on the label."  However, as early as 2008, a Walmart employee expressed concerns that Welspun was selling fake Egyptian cotton sheets.  Walmart nonetheless continued to market, sell, and deliver Welspun products labeled "100% Egyptian Cotton."  Walmart pulled Welspun products from its shelves only after knowledge of Welspun's false labeling the Affected Bed Linens became public in August 2016.

43.     Before Target announced in August 2016 that it was cutting ties with Welspun, it had been investigating Welspun for months.  Prior to August 2016, Target knew or should have known that it was marketing, selling, and delivering mislabeled Welspun linens.  At the very least, Target knew during the pendency of its investigation that it did not have sufficient information to represent to its customers that the Affected Bed Linens were accurately labeled. Nonetheless, Target continued to market, sell, and deliver Affected Bed Linens until August 2016.

44.     BB&B knew or should have known prior to August 2016 that it was marketing, selling, and delivering Affected Ben Linens.  At the very least, BB&B knew that it did not have sufficient information to represent to its customers that the linens were accurately labeled by August 24, 2016, when it began auditing to the Affected Bed Linens to determine whether they

14

were accurately labeled.  Nonetheless, BB&B continued to market, sell, and deliver the Affected

Bed Linens for nearly three months during the pendency of that audit.

## CLASS ACTION ALLEGATIONS

45.     For purposes of the Express and Implied Warranty claims (Counts IV and V,

respectively), the Unjust Enrichment claim (Count VI), the Negligent Misrepresentation and

Fraud claims (Counts VII and VIII, respectively), and the Magnuson-Moss Warranty Act (Count

IX), all of the Plaintiffs seek to represent a class defined as all persons in the United States who

purchased Affected Bed Linens labeled "100% Egyptian Cotton" or "100% Long-Staple

Egyptian Cotton" from a Retailer[5] during the class period.  Excluded from the Class are

Defendants, their affiliates, employees, officers and directors, persons or entities that purchased

Affected Bed Linens for resale, and the Judge(s) assigned to this case.

46.     For purposes of the consumer protection laws of California (Counts I-III),

Plaintiffs Brower, Talili, and Mistler also seek to represent a California Subclass defined as all

persons in California who purchased Affected Bed Linens labeled "100% Egyptian Cotton" or

"100% Long-Staple Egyptian Cotton" from a Retailer during the class period.  Excluded from

the California Subclass are Defendants, their affiliates, employees, officers and directors, persons

or entities that purchased Affected Bed Linens for resale, and the Judge(s) assigned to this case.

47.     For purposes of the consumer protection laws of New York (Counts X and XI),

Plaintiff Jividen also seeks to represent a New York Subclass defined as all persons in New York

who purchased Affected Bed Linens labeled "100% Egyptian Cotton" or "100% Long-Staple

Egyptian Cotton" from a Retailer during the class period.  Excluded from the New York

---

[5] "Retailer" means Walmart, BB&B, Target, Macys, JC Penney, Kohl's, K Mart, Sears, Sam's
Club, CostCo, Burlington Coat Factory, Ross Stores, Bon Ton, Belk, Inc., Anna's Linen and any
other retail company that sold Welspun linens in the United States.

Subclass are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased Affected Bed Linens for resale, and the Judge(s) assigned to this case.

48.     Plaintiffs reserve the right to amend the above class definitions as appropriate after further investigation or discovery.

49.     The members of the Classes are so numerous and widely dispersed that joinder of all members is impracticable.  On information and belief, millions of Class members have purchased Affected Bed Linens mislabeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Welspun and third party retailers and vendors.

50.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

   a.   Whether Defendants breached an express warranty made to Plaintiffs and the Class;

   b.   Whether Defendants advertised or marketed Affected Bed Linens in a way that was false or misleading;

   c.   Whether Defendants' conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

   d.   Whether Class members have been injured by Defendants' conduct;

   e.   Whether Class members suffered an ascertainable loss as a result of Defendants' misrepresentations;

f.   Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

g.   Whether Defendants violated California Civil Code §§ 1750, *et seq.*;

h.   Whether Defendants violated California Business & Professions Code §§ 17200, *et seq.*;

i.   Whether Defendants violated California Business & Professions Code §§ 17500, *et seq.*

j.   Whether Defendants violated New York General Business Law § 349; and

k.   Whether Defendants violated New York General Business Law § 350.

51.   The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs purchased one or more Affected Ben Linens.

52.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class or Subclass members they seek to represent.  Plaintiffs also have retained competent counsel experienced in prosecuting class actions, and intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

53.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  The monetary value of each individual Class member's claim is small compared to the burden and expense of individual litigation.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In

contrast, the class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that

all claims and claimants are before this Court for consistent adjudication of the liability issues.

Judicial economy is served by litigating the Class claims in one case.

**COUNT I**
**Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***

54.     Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint.

55.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf

of the members of the proposed California Subclass against Defendants.

56.     Plaintiffs Brower, Talili, Mistler, and the California Subclass members are

consumers who purchased Affected Bed Linens for personal, family or household purposes.

Plaintiffs and the California Subclass members are "consumers" as that term is defined by the

CLRA in Cal. Civ. Code § 1761(d).

57.     The Affected Bed Linens that Plaintiffs Brower, Talili, Mistler, and other

California Subclass members purchased from Defendants were "goods" within the meaning of

Cal. Civ. Code § 1761(a).

58.     Defendants' actions, representations, and conduct violated and continue to violate

the CLRA because they extend to transactions that intended to result, or which have resulted in,

the sale of goods to consumers.

59.     Cal. Civ. Code § 1770(a)(4), prohibits "using deceptive representations or

designations of geographic origin in connection with goods or services."  Cal. Civ. Code

§ 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval,

18

characteristics, ingredients, uses, benefits, or quantities which they do not have …."  Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

60.     Defendants violated Cal. Civ. Code § 1770(a)(4), (a)(5), and (a)(9) by misrepresenting that the Affected Bed Linens were made with "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton," as alleged herein.

61.     Plaintiffs Brower, Talili, Mistler, and the California Subclass suffered injuries caused by Defendants because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

62.     On or about September 19, 2016, prior to filing this action, a CLRA notice letter was served on Defendants Welspun India and Welspun USA which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, and advised Welspun India and Welspun USA that they are in violation of the CLRA and demanded that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.

63.     A declaration establishing venue was submitted and attached to the original complaint filed in this case wherein plaintiffs asserted a claim under the CLRA, *Brower et al. v. Welspun India Ltd. et al.*, Case No. 16-cv-07318.

19

64.     Wherefore, Plaintiffs Brower, Talili, and Mistler seek damages, restitution, and injunctive relief from Welspun for its violations of the CLRA.  Plaintiffs Brower, Talili, and Mistler seek injunctive relief from Walmart, BB&B, and Target for their violations of the CLRA.

## COUNT II
### Violation Of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*

65.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

66.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

67.     Defendants are subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

68.     Defendants violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, the Textile Act, and 16 C.F.R. §§ 303.16(d) and § 303.27, as alleged herein.

69.     Defendants' misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

70.     Defendants violated the "fraudulent" prong of the UCL by making misrepresentations that the Affected Bed Linens were made from "100% Egyptian cotton or "100% Long-Staple Egyptian Cotton," as described herein.

71.     Plaintiffs Brower, Talili, Mistler, and the California Subclass lost money or property as a result of Defendants' UCL violations because: (a) they would not have purchased

20

the Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

### COUNT III
### Violation Of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq.*

72.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

73.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

74.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

75.     Defendants committed acts of false advertising, as defined by §§17500, *et seq.,* by misrepresenting that Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

76.     Defendants knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that their representations about the Affected Bed Linens were untrue and misleading.

77.     Defendants' actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

78.     Plaintiffs Brower, Talili, Mistler, and the California Subclass lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT IV
### Breach Of Express Warranty

79.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

80.     Plaintiffs bring this claim individually and on behalf of the proposed Class against all Defendants.

81.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, expressly warranted that the Affected Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

82.     In fact, the Affected Bed Linens do not conform to the express warranty because they are not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

83.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiffs and Class members have been injured and harmed because:  (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT V
### Breach Of The Implied Warranty Of Merchantability

84.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

85.     Plaintiffs bring this claim individually and on behalf of the proposed Class against all Defendants.

86.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Affected Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

87.     As a direct and proximate cause of Defendants' breach of implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or

"100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

88.     Plaintiffs and Class members purchased the Affected Bed Linens in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

89.     The Affected Bed Linens were not altered by Plaintiffs or Class members.

90.     The Affected Bed Linens were defective when they left the exclusive control of Defendants.

91.     Defendants knew that the Affected Bed Linens would be purchased and used without additional testing by Plaintiffs and Class members.

92.     The Affected Bed Linens were defectively designed and unfit for their intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

93.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT VI
## Unjust Enrichment

94.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

95.     Plaintiffs bring this claim individually and on behalf of the proposed Class against all Defendants.

96.     Plaintiffs and Class members conferred benefits on Defendants by purchasing the Affected Bed Linens.

97.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Affected Bed Linens.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  These misrepresentations caused injuries to Plaintiffs and Class members because they would not have purchased the Affected Bed Linens on the same terms if the true facts were known.

98.     Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and Class members for their unjust enrichment, as ordered by the Court.

## COUNT VII
### Negligent Misrepresentation

99.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

100.     Plaintiffs bring this claim individually and on behalf of the proposed Class against all Defendants.

101.     As discussed above, Defendants misrepresented that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

102.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

103.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about the Affected Bed Linens.

104.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Affected Bed Linens.

105.     Plaintiffs and Class members would not have purchased the Affected Bed Linens on the same terms if the true facts had been known.

106.     The negligent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VIII
**Fraud**

107.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

108.     Plaintiffs bring this claim individually and on behalf of the proposed Class against all Defendants.

109.     As discussed above, Defendants provided Plaintiffs and Class members with false or misleading material information and failed to disclose material facts about Affected Bed Linens, including by misrepresenting that the Affected Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" linens and failing to disclose that they were not "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  These misrepresentations and omissions were made with knowledge of their falsehood.

26

110.     The misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Affected Bed Linens.

111.     The fraudulent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT IX**
**Violation Of The Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.***

112.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

113.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against all Defendants.

114.     The Affected Bed Linens are consumer products as defined in 15 U.S.C. § 2301(1).

115.     Plaintiffs and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

116.     Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

117.     In connection with the sale of the Affected Bed Linens, Defendants issued an implied warranty as defined in 15 U.S.C. § 2301(7), by making a false promise or affirmation on its container or label that Affected Bed Linens were "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton."

118.     The Affected Bed Linens do not conform to the implied warranty because the implied warranty is false and misleading.

119.    By reason of Defendants' breach of the implied warranty of merchantability, Defendants violated the statutory rights due Plaintiffs and the Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and members of the Class.

120.    Plaintiffs and the Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT X
### Violation Of New York Gen. Bus. Law § 349

121.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

122.    Plaintiff Jividen brings this claim individually and on behalf of the members of the New York Subclass against all Defendants.

123.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Defendants.

124.    The foregoing deceptive acts and practices were directed at consumers.

125.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Affected Linen Products to induce consumers to purchase same.

126.    Plaintiff Jividen and members of the New York Subclass were injured and harmed because:  (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

127.    As a result of Defendants' false, misleading, and deceptive statements and representations of fact, Plaintiff Jividen and members of the New York Subclass have suffered economic injury.

128.    Plaintiff Jividen and members of the New York Subclass suffered an ascertainable loss caused by Defendants' misrepresentations equal to the price premium they paid for the Affected Bed Linens.

129.    On behalf of himself and other members of the New York Subclass, Plaintiff Jividen seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT XI
### Violation Of New York Gen. Bus. Law § 350

130.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

131.    Plaintiff Jividen brings this claim individually and on behalf of the members of the New York Subclass against all Defendants.

132.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Defendants.

133.     Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

134.     Defendants' false, misleading and deceptive statements and representations of fact were and are directed to consumers.

135.     Defendants' false, misleading and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

136.     Defendants' false, misleading and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

137.     Plaintiff Jividen and members of the New York Subclass were injured because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

138.     As a result of Defendants' false, misleading, and deceptive statements and representations of fact Plaintiff Jividen and members of the New York Subclass have suffered and continue to suffer economic injury.

139.    Plaintiff Jividen and members of the New York Subclass suffered an ascertainable loss caused by Defendants' misrepresentations equal to the price premium they paid for the Affected Bed Linens.

140.    On behalf of himself and other members of the New York Subclass, Plaintiff Jividen seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendants as follows:

a.  For an order certifying the classes described herein under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Classes and Plaintiffs' attorneys as Class Counsel;

b.  For an order declaring that Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiffs, and the class members on all counts asserted herein;

d.  For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, and expenses;

h.   Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

i.   For injunctive relief enjoining the illegal acts detailed herein;

j.   For such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.


Dated:  February 27, 2017                    Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**

                                             By:  ___*/s/ Scott A. Bursor*_____
                                                     Scott A. Bursor

                                             Scott A. Bursor
                                             Joseph I. Marchese
                                             Frederick J. Klorczyk III
                                             888 Seventh Avenue
                                             New York, NY  10019
                                             Telephone: (646) 837-7150
                                             Facsimile:  (212) 989-9163
                                             Email:  scott@bursor.com
                                                       jmarchese@bursor.com
                                                       fklorczyk@bursor.com

                                             *Interim Class Counsel*